FILED

2016 JUN 16 PM 5:38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2015 Grand Jury

| UNITED STATES OF AMERICA, | No. CR16-0415 |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 2(b): Causing an Act to be Done; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7); 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| DONALD WOO LEE, aka "Donald Lee," aka "Donald Woolee," | |
| Defendant. | |

The Grand Jury charges:

COUNTS ONE THROUGH SEVEN

[18 U.S.C. §§ 1347, 2(b)]

A.  INTRODUCTORY ALLEGATIONS

At all times relevant to this Indictment:

1.  Defendant DONALD WOO LEE, M.D., also known as ("aka") "Donald Lee," aka "Donald Woolee" ("LEE"), was a physician who owned, operated, and oversaw a medical clinic located at 27555 Ynez Road Suite 105, Temecula, California, within the Central District of California ("Temecula Clinic"). Defendant LEE also owned, operated, and oversaw a medical clinic located

at 10241 Country Club Drive, Suite H, Mira Loma, California, within the Central District of California ("Mira Loma Clinic").

Prime Partners Medical Group, Inc.

2. On or about July 10, 2002, defendant LEE filed a Certificate of Amendment with the California Secretary of State in which he renamed an existing corporation, Donald Woo Lee, M.D., Inc., as Prime Partners Medical Group, Inc. ("Prime Partners").

3. On or about February 21, 2006, defendant LEE, as the President of Prime Partners, opened corporate bank account number ****-3161 at Pacific Western Bank ("Pacific Western Account"). Defendant LEE was the sole authorized signatory on this account.

4. On or about August 12, 2013, a Statement of Information was filed with the California Secretary of State for Prime Partners. This Statement of Information listed defendant LEE as the Chief Executive Officer, Secretary, Chief Financial Officer, and Agent for Service of Process, and identified the Temecula Clinic as Prime Partners' business address.

5. On or about November 19, 2013, defendant LEE, as the Chief Executive Officer of Prime Partners, opened corporate bank account number ***-9662 at Rabobank, N.A. ("Rabobank Account 1"). Defendant LEE was an authorized signatory on this account.

6. On or about December 10, 2013, defendant LEE executed and submitted an electronic funds transfer agreement ("EFT") to Medicare to receive payment by electronic transfers into Rabobank Account 1.

7. On or about April 30, 2014, defendant LEE executed and submitted an enrollment application to Medicare adding a practice location.

8. On or about September 29, 2014, defendant LEE executed and submitted an enrollment application to Medicare adding another practice location.

Donald Woo Lee, M.D., A Professional Corporation

9. On or about April 13, 2015, defendant LEE incorporated "Donald Woo Lee, M.D., A Professional Corporation," with a business address at the Temecula Clinic.

10. On or about April 16, 2015, a Statement of Information was filed with the California Secretary of State for "Donald Woo Lee, M.D., A Professional Corporation." This Statement of Information listed defendant LEE as the Chief Executive Officer, Secretary, Chief Financial Officer, and Director, and identified the Temecula Clinic as the business address for "Donald Woo Lee, M.D., A Professional Corporation."

11. On or about April 20, 2015, defendant LEE, as the Chief Executive Officer of "Donald Woo Lee, M.D., A Professional Corp.," opened corporate bank account number ****-2496 at Rabobank, N.A. ("Rabobank Account 2"). Defendant LEE was the sole authorized signatory on this account.

12. On or about May 14, 2015, defendant LEE executed and submitted an initial enrollment application to Medicare enrolling "Donald Woo Lee, M.D., A Professional Corporation" for the Temecula Clinic and the Mira Loma Clinic.

///
///

13. On or about May 14, 2015, defendant LEE executed and submitted an EFT to Medicare, to receive payment by electronic transfers into Rabobank Account 2.

14. In or around July 2015, after Security Bank of California purchased Rabobank, Rabobank Account 2 became Security Bank of California account number ****-1302 ("Security Bank Account").

15. On or about July 31, 2015, defendant LEE executed and submitted an EFT to Medicare, to receive payment by electronic transfers into the Security Bank Account.

16. On or about September 24, 2015, defendant Lee executed and submitted an Electronic Data Interchange Agreement ("EDI") to Medicare.

Medicare Claims Submitted by defendant LEE

17. Between September 2012 and September 2015, defendant LEE submitted and caused the submission of approximately $14,699,359 in claims to Medicare, of which approximately $12,448,300 was for vein ablation procedures and related procedures. Of the amounts claimed, Medicare paid defendant LEE $5,172,808, of which $4,576,861 was for vein ablation procedures and related procedures.

Vein Ablation Procedures

18. Patients with varicose veins sometimes also had venous reflux, that is, a condition in which blood in the patient's veins flowed wrongly away from the heart rather than towards the heart. The condition could cause the patient's blood to pool in the veins of the patient's lower legs, leading to enlargement of the veins, and potentially causing a variety of symptoms such as

4

leg pain, leg heaviness, and leg fatigue, among others. In advanced cases, leg swelling, dermatitis, inflammation and hardening of the skin, and/or discoloration of the skin could occur. In the most advanced cases, skin ulceration could also develop.

19. In such situations, a vein ablation procedure was used to treat potentially significant health issues arising from the condition. There were various types of vein ablation procedures, including a radiofrequency vein ablation procedure and an endomechanical vein ablation procedure.

20. The radiofrequency vein ablation procedure used a generator unit attached by a long cord to a long, thin disposable catheter. During this procedure, a physician inserted the catheter into the patient's vein. An ultrasound device guided the catheter into and through the varicose vein, until the catheter reached the end of the varicose vein or the varicose segment of the vein. As the catheter, guided by ultrasound, was gradually pulled out of the vein, radiofrequency waves were emitted to collapse the vein. When the catheter was completely removed, the vein was entirely collapsed. After a successful procedure, the patient's blood naturally found new paths through smaller, healthier veins.

21. The endomechanical vein ablation procedure was a minimally invasive treatment for varicose veins, combining mechanical and chemical modalities. The procedure was performed with a special, one-time use, percutaneous infusion catheter, which contained a rotating wire that provided endovenous

mechanical destruction and simultaneously dispersed a physician specified agent (sclerosant) in the targeted vein. Like the radiofrequency vein ablation procedure, successful execution of the endomechanical vein ablation procedure would result in the blood previously at risk of pooling finding healthier veins through which to flow.

The Medicare Program

22. Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

23. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number ("HICN"). Physicians and other health care providers that provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

24. To participate in Medicare, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for processing and payment of claims.

25. A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

26. Medicare generally reimbursed a provider for physician services that were medically necessary to the health of the beneficiary and were personally furnished by the physician or the physician's employee under the physician's direction.

27. CMS contracted with regional contractors to process and pay Medicare claims. Noridian Administrative Services ("Noridian") was the contractor that processed claims involving Medicare Part B physician services in Southern California from approximately September 2013 to the present. Prior to that, from approximately 2009 to approximately August 2013, the contractor for Part B physician services was Palmetto GBA.

28. Providers, including defendant LEE, submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they: (a) were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) would submit claims that were accurate, complete, and truthful.

29. A Medicare claim for payment was required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date that the services were provided; and the name and National Provider Identifier ("NPI") of the provider who provided the item or service.

30. Medicare reimbursed providers for the radiofrequency and endomechanical vein ablation procedures only in certain circumstances. In particular, Medicare required providers seeking reimbursement for such procedures to use and document non-invasive conservative treatments for a specified period before performing the invasive procedures. The conservative treatments to be attempted during this period, which under Medicare guidelines was required to last six to eight weeks, included but were not limited to, the deployment of non-invasive treatment options such as regular leg elevation, rest, and the use of compression stockings. If conservative treatments were not used and documented during the requisite period, then Medicare would not deem radiofrequency and endomechanical vein ablation to be medically necessary procedures.

31. Medicare reimbursement amounts are determined according to the Current Procedural Terminology ("CPT") code for a certain procedure, service, or product. If a patient required two or more vein ablation procedures in a single extremity, then the provider generally was required to perform these procedures at the same time. If a provider performed two or more procedures in a single extremity at the same time, then the provider billed for these additional "piggyback" procedures using a certain CPT code, which had a significantly lower reimbursement rate than the "parent" CPT code.

B.  THE SCHEME TO DEFRAUD

32. Beginning at least as early as in or around September 2012, and continuing at least through in or around September 2015, in Riverside County, within the Central District of

California, and elsewhere, defendant LEE, together with others known and unknown to the Grand Jury, knowingly, willfully, and with intent to defraud, executed, and attempted to execute, a scheme and artifice: (a) to defraud a health care benefit program, namely Medicare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Medicare by means of material false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

33. The fraudulent scheme operated, in substance, as follows:

    a. Defendant LEE falsely represented, and caused other to falsely represent, to Medicare beneficiaries that they needed vein ablation procedures, when in fact, as defendant LEE then well knew, the beneficiaries had no visible signs of varicose veins, had no adverse symptoms from varicose veins, and had no medical need for a vein ablation procedure to be performed on them.

    b. Despite the fact that Medicare required conservative treatments to be used and documented for a six-week to eight-week period before a vein ablation procedure would be considered medically necessary, defendant LEE did not employ any conservative treatments on the Medicare beneficiaries before performing the vein ablation procedures. Defendant LEE performed invasive vein ablation procedures without having followed the required conservative treatments and despite the

absence of extreme varicosity, on Medicare beneficiaries including the following, identified by their initials: D.F., F.S., O.P., S.M., C.C., D.P., and R.O.

    c. Defendant LEE also performed multiple vein ablation procedures on Medicare beneficiaries on different occasions even though the procedures could have all been provided on a single occasion. The purpose of performing multiple procedures on different occasions was to enable defendant LEE to increase the amount he could bill to Medicare. Defendant LEE performed between two and seven procedures on different dates, in violation of Medicare's "global" requirement that the procedures be performed on the same date, if possible, on Medicare beneficiaries including the following, who are identified by their initials: D.F., F.S., K.C., O.P., S.M., C.C., and D.P.

    d. Defendant LEE, together with others known and unknown to the Grand Jury, submitted and caused the submission of false and fraudulent claims to Medicare for reimbursement for the vein ablation procedures. When defendant LEE submitted and caused the submission of these claims, defendant LEE knew that the procedures were medically unnecessary. On some occasions, defendant LEE submitted and caused the submission of claims to Medicare for services that were never actually provided to the Medicare beneficiaries.

C.   <u>EXECUTIONS OF THE FRAUDULENT SCHEME</u>

    34. On or about the dates set forth below, within the Central District of California, and elsewhere, defendant LEE, together with others known and unknown to the Grand Jury,

knowingly and willfully executed and attempted to execute the fraudulent scheme described above, by submitting and causing to be submitted to Medicare for payment the following false and fraudulent claims:

| COUNT | BENEFICIARY | APPROX. DATE ALLEGED SERVICES PERFORMED | APPROX. DATE CLAIM SUBMITTED | ALLEGED SERVICES AND SERVICE CODE | APPROX. AMOUNT OF CLAIM | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ONE | C.C. | 03/09/2013 | 03/25/2013 | Destruction of insufficient vein of arm or leg, accessed through the skin, Code 36475 | $3,000 | 540913 084573 560 |
| TWO | C.C. | 03/16/2013 | 03/25/2013 | Destruction of insufficient vein of arm or leg, accessed through the skin, Code 36475 | $3,000 | 540913 084573 550 |
| THREE | S.M. | 02/24/2014 | 03/04/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540214 064014 310 |
| FOUR | F.S. | 06/14/2014 | 06/30/2104 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914 181348 510 |

///
///

11

| COUNT | BENE-FICIARY | APPROX. DATE ALLEGED SERVICES PERFORMED | APPROX. DATE CLAIM SUBMITTED | ALLEGED SERVICES AND SERVICE CODE | APPROX. AMOUNT OF CLAIM | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| FIVE | S.M. | 06/16/2014 | 6/25/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914176195600 |
| SIX | C.B. | 11/08/2014 | 11/17/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540214322140730 |
| SEVEN | P.C. | 12/01/2014 | 12/17/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914351829830 |

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and
28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is hereby given to defendant DONALD WOO LEE, M.D., also known as ("aka") "Donald Lee," aka "Donald Woolee" ("LEE"), that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under any of the Counts One through Seven of this Indictment.

2. Defendant shall forfeit to the United States the following property:

    a. All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in any of Counts One through Seven of this Indictment; and

    b. A sum of money equal to the total value of the property described in subparagraph a.

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence;

13

(b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

GEORGE S. CARDONA
Assistant United States Attorney
Chief, Major Frauds Section

RANEE KATZENSTEIN
Assistant United States Attorney
Deputy Chief, Major Frauds Section

PABLO QUIÑONES
Deputy Chief, Fraud Section
United States Department of Justice

DIIDRI ROBINSON
Assistant Chief, Fraud Section
United States Department of Justice

BLANCA QUINTERO
Trial Attorney, Fraud Section
United States Department of Justice

14