FILED

2018 JUN -7 PM 2:53

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>DONALD WOO LEE,<br>　aka "Donald Lee,"<br>　aka "Donald Woolee,"<br><br>　　　　Defendant. | No. CR-16-0415(A)-GW<br><br>F I R S T<br>S U P E R S E D I N G<br>I N D I C T M E N T<br><br>[18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 2(b): Causing an Act to be Done; 21 U.S.C. §§ 331(k), 333(a)(2), 351(a)(2)(A): Adulteration; 18 U.S.C. § 152(3): False Declarations in Bankruptcy; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(7); 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH SEVEN

[18 U.S.C. §§ 1347, 2(b)]

A.　INTRODUCTORY ALLEGATIONS

At all times relevant to this First Superseding Indictment:

The Medicare Program

　1.　Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who

were 65 years and older or disabled.   Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.   Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2.   Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."   Physicians and other health care providers who provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

3.   To participate in Medicare, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations.   If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for processing and payment of claims.

4.   A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

5.   Medicare generally reimbursed a provider for physician services that were medically necessary to the health of the beneficiary and were personally furnished by the physician or the physician's employee under the physician's direction.

6.   CMS contracted with regional contractors to process and pay Medicare claims.   Noridian Administrative Services ("Noridian") was the contractor that processed claims involving Medicare Part B physician services in Southern California from

approximately September 2013 to the present.  Prior to that, from approximately 2009 to approximately August 2013, the contractor for Part B physician services was Palmetto GBA.

7.  Providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they: (a) were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) would submit claims that were accurate, complete, and truthful.

8.  A Medicare claim for payment was required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the type of service provided to the beneficiary; the date that the service was provided and the charge for the service provided; and the name and National Provider Identifier ("NPI") of the provider who provided the item or service.

Vein Ablation Procedures

9.  Patients with varicose veins sometimes also had venous reflux, that is, a condition in which blood in the patient's veins flowed wrongly away from the heart rather than towards the heart.  The condition could cause the patient's blood to pool in the veins of the patient's lower legs, leading to enlargement of the veins, and potentially causing a variety of symptoms such as leg pain, leg heaviness, and leg fatigue, among others.  In advanced cases, leg swelling, dermatitis, inflammation and hardening of the skin, and/or discoloration of the skin could

3

occur.   In the most advanced cases, skin ulceration could also develop.

10.   In such situations, a vein ablation procedure was used to treat potentially significant health issues arising from the condition.   There were various types of vein ablation procedures, including a radiofrequency vein ablation procedure and an endomechanical vein ablation procedure.

11.   The radiofrequency vein ablation procedure used a generator unit attached by a long cord to a long, thin disposable catheter.   During this procedure, a physician inserted the catheter into the patient's vein.   An ultrasound device guided the catheter into and through the varicose vein, until the catheter reached the end of the varicose vein or the varicose segment of the vein.   As the catheter, guided by ultrasound, was gradually pulled out of the vein, radiofrequency waves were emitted to collapse the vein.   When the catheter was completely removed, the vein was entirely collapsed.   After a successful procedure, the patient's blood naturally found new paths through smaller, healthier veins.

12.   The endomechanical vein ablation procedure was a minimally invasive treatment for varicose veins, combining mechanical and chemical modalities.   The procedure was performed using a single-use, percutaneous infusion catheter that contained a rotating wire that provided endovenous mechanical destruction and simultaneously dispensed a physician-specified agent (sclerosant) in the targeted vein.   Like the radiofrequency vein ablation procedure, successful execution of

the endomechanical vein ablation procedure resulted in the closing of the veins where reflux occurred, thereby diverting blood previously at risk of pooling to healthier veins.

13. Medicare reimbursed providers for the radiofrequency and endomechanical vein ablation procedures only in certain circumstances. In particular, Medicare required providers seeking reimbursement for such procedures to use and document non-invasive conservative treatments for a specified period before performing the invasive procedures. The conservative treatments to be attempted during this period, which under Medicare guidelines was required to last six to eight weeks, included, but were not limited to, the deployment of non-invasive treatment options such as regular leg elevation, rest, and the use of compression stockings. If conservative treatments were not used and documented during the requisite period, then Medicare would not deem radiofrequency and endomechanical vein ablation to be medically necessary procedures.

### Billing Codes and Procedures

14. The Medicare program required that reimbursement claims for services report the type of service using the American Medical Association's Current Procedural Terminology ("CPT") codes. CPT codes were intended to accurately identify, simplify, and standardize billing for medical services. The amount of reimbursement to a provider for a service based on CPT code varied depending on the work involved in the procedure, the complexity of the procedure, practice expense, and malpractice expense.

15.   CPT codes 36475 and 36476 were used for radiofrequency vein ablation procedures, while CPT codes 93970 and 93971 were used for the duplex ultrasound examinations that were performed prior to a vein ablation procedure.   Between January 1, 2014 and January 1, 2017, CPT codes 37799 or 36299 were used for endomechanical vein ablation procedures.   Thereafter, CPT codes 36473 and 36474 were used for these procedures.

<u>Defendant LEE and Related Entities</u>

16.   Defendant DONALD WOO LEE, M.D., also known as ("aka") "Donald Lee," aka "Donald Woolee" ("LEE"), was a physician who owned, operated, and oversaw a medical clinic located at 27555 Ynez Road Suite 105, Temecula, California, within the Central District of California ("Temecula Clinic").   Defendant LEE also owned, operated, and oversaw a medical clinic located at 10241 Country Club Drive, Suite H, Mira Loma, California, within the Central District of California ("Mira Loma Clinic").   Defendant LEE also owned, operated, and oversaw a medical clinic located at 1105 South State Street, Hemet, California, within the Central District of California ("Hemet Clinic").   Defendant LEE also owned, operated, and oversaw a medical clinic located at 500 N. Broadway, Suite 17, Blythe, California, within the Central District of California ("Blythe Clinic").   Defendant LEE was approved to participate in the Medicare program and was issued a provider number on or about December 28, 1999.

17.   Prime Partners Medical Group, Inc. ("Prime Partners"), was a corporation registered in the State of California, operating in Temecula, California, within the Central District of California.   Defendant LEE, as the President of Prime

1 Partners, opened corporate bank account number ****-3161 at

2 Pacific Western Bank ("Pacific Western Account 1"). Defendant

3 LEE was the sole authorized signatory on this account.

4 Defendant LEE, as the Chief Executive Officer of Prime Partners,

5 opened corporate bank account number ***-9662 at Rabobank, N.A.

6 ("Rabobank Account 1"). Defendant LEE was an authorized

7 signatory on this account. On or about December 10, 2013,

8 defendant LEE executed and submitted an electronic funds

9 transfer agreement ("EFT") to Medicare to receive payment by

10 electronic transfers into Rabobank Account 1.

11     18. SD Medical Clinic, Inc., A Professional Corporation

12 ("SD Medical Clinic"), was a corporation registered in the State

13 of California, operating in Temecula, California, within the

14 Central District of California. Defendant LEE, as the Chief

15 Executive Officer, Chief Financial Officer and Secretary of SD

16 Medical Clinic opened corporate bank account number ****-3346 at

17 Pacific Western Bank ("Pacific Western Account 2"). Defendant

18 LEE was the sole authorized signatory on this account.

19     19. Donald Woo Lee, M.D., A Professional Corporation ("DWL

20 Corp."), was a corporation registered in the State of

21 California, operating in Temecula, California, within the

22 Central District of California. Defendant LEE, as the Chief

23 Executive Officer of DWL Corp., opened corporate bank account

24 number ****-2496 at Rabobank, N.A. ("Rabobank Account 2").

25 Defendant LEE was the sole authorized signatory on this account.

26 On or about June 23, 2015, defendant LEE executed and submitted

27 an EFT to Medicare, to receive payment by electronic transfers

28 into Rabobank Account 2. In or around July 2015, after Security

1   Bank of California purchased Rabobank, Rabobank Account 2 became

2   Security Bank of California account number ****-1302 ("Security

3   Bank Account").  On or about July 31, 2015, defendant LEE

4   executed and submitted an EFT to Medicare, to receive payment by

5   electronic transfers into the Security Bank Account.

6   B.   THE SCHEME TO DEFRAUD

7        20.   Beginning at least as early as in or around September

8   2012, and continuing at least through in or around September

9   2015, in Riverside County, within the Central District of

10  California, and elsewhere, defendant LEE, together with others

11  known and unknown to the Grand Jury, knowingly, willfully, and

12  with intent to defraud, executed, and attempted to execute, a

13  scheme and artifice: (a) to defraud a health care benefit

14  program, namely Medicare, as to material matters in connection

15  with the delivery of and payment for health care benefits,

16  items, and services; and (b) to obtain money from Medicare by

17  means of material false and fraudulent pretenses and

18  representations and the concealment of material facts in

19  connection with the delivery of and payment for health care

20  benefits, items, and services.

21       21.   The fraudulent scheme operated, in substance, as

22  follows:

23

24

25

26

27

28

        a.    Defendant LEE falsely represented, and caused others to falsely represent, to Medicare beneficiaries that they needed vein ablation procedures, when in fact, as defendant LEE then well knew, the beneficiaries had no visible signs of varicose veins, had no adverse symptoms from varicose veins, and/or had no medical need for a vein ablation procedure to be performed on them.

        b.    Despite the fact that Medicare required conservative treatments to be used and documented for a six-week to eight-week period before a vein ablation procedure would be considered medically necessary, defendant LEE did not employ any conservative treatments on the Medicare beneficiaries before performing the vein ablation procedures.  Defendant LEE performed invasive vein ablation procedures on Medicare beneficiaries without having followed the required conservative treatments and despite the absence of extreme varicosity.

        c.    Defendant LEE, together with others known and unknown to the Grand Jury, submitted and caused the submission of false and fraudulent claims to Medicare for reimbursement for the vein ablation procedures.  When defendant LEE submitted and caused the submission of these claims, defendant LEE knew that the procedures were medically unnecessary.  On at least one occasion, defendant LEE submitted and caused the submission of a claim to Medicare for a service that was never provided to the Medicare beneficiary.

d.    Defendant LEE, together with others known and unknown to the Grand Jury, submitted and caused the submission of false and fraudulent claims for endomechanical vein ablation procedures to Medicare using CPT code 37241 in order to obtain a higher reimbursement than defendant LEE would have received had he submitted claims using the appropriate CPT code (37799 or 36299), a practice known as "upcoding."  No later than November 3, 2014, defendant LEE knew that CPT code 37241 was an incorrect code to use to bill Medicare for endomechanical vein ablation procedures.  Between November 2014 and September 2015, defendant LEE submitted and caused the submission of approximately $2,837,100 in claims to Medicare using CPT code 37241, many of which were fraudulently upcoded.

22.    Between September 2012 and September 2015, defendant LEE submitted and caused the submission of approximately $14,699,359 in claims to Medicare, of which approximately $12,448,300 was for vein ablation procedures and related procedures, many of which were medically unnecessary.  Of the amounts claimed, Medicare paid defendant LEE $5,172,808, of which $4,576,861 was for vein ablation procedures and related procedures.

B.    EXECUTIONS OF THE FRAUDULENT SCHEME

23.    On or about the dates set forth below, within the Central District of California, and elsewhere, defendant LEE, together with others known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute the fraudulent scheme described above, by submitting and causing to be submitted to Medicare for payment the following false and

fraudulent claims:

| COUNT | BENE-FICIARY | APPROX. DATE ALLEGED SERVICES PERFORMED | APPROX. DATE CLAIM SUBMITTED | ALLEGED SERVICES AND CPT CODE | APPROX. AMOUNT OF CLAIM | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| ONE | C.C. | 03/09/2013 | 03/25/2013 | Destruction of insufficient vein of arm or leg, accessed through the skin, Code 36475 | $3,000 | 540913 084573 560 |
| TWO | C.C. | 03/16/2013 | 03/25/2013 | Destruction of insufficient vein of arm or leg, accessed through the skin, Code 36475 | $3,000 | 540913 084573 550 |
| THREE | S.M. | 02/24/2014 | 03/04/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540214 064014 310 |
| FOUR | F.S. | 06/14/2014 | 06/30/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914 181348 510 |

| COUNT | BENE-FICIARY | APPROX. DATE ALLEGED SERVICES PERFORMED | APPROX. DATE CLAIM SUBMITTED | ALLEGED SERVICES AND CPT CODE | APPROX. AMOUNT OF CLAIM | CLAIM NUMBER |
|---|---|---|---|---|---|---|
| FIVE | S.M. | 06/16/2014 | 06/25/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914 176195 600 |
| SIX | C.B. | 11/08/2014 | 11/17/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540214 322140 730 |
| SEVEN | P.C. | 12/01/2014 | 12/17/2014 | Occlusion of venous malformations (other than hemorrhage) with radiological supervision and interpretation, roadmapping, and imaging guidance, Code 37241 | $8,900 | 540914 351829 830 |

COUNT EIGHT

[21 U.S.C. §§ 331(k), 333(a)(2), 351(a)(2)(A)]

24.   The Grand Jury hereby repeats and alleges paragraphs 9-12 and 16 of this First Superseding Indictment as if fully set forth herein.

The Food, Drug, and Cosmetic Act

25.   At all times relevant to this First Superseding Indictment, the U.S. Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the American public by ensuring, among other things, that medical devices were safe and effective for their intended uses and were not adulterated or misbranded.   FDA carried out its responsibilities by enforcing the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Sections 301-399f, and other pertinent laws and regulations.

26.   Under the FDCA, a medical device is defined as, among other things, "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or intended to affect the structure or function of the body of man or other animals, and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes."   21 U.S.C. §§ 321(h)(2), 321(h)(3).

13

27.   Under the FDCA, a medical device was adulterated if it was prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health.   21 U.S.C. § 351(a)(2)(A).

28.   Under the FDCA, it is unlawful to do any act or cause any act to be done with respect to a medical device while the device was held for sale after shipment in interstate commerce, if such act resulted in the device being adulterated.   21 U.S.C. § 331(k).   Such conduct is a felony when performed with the intent to defraud or mislead.   21 U.S.C. § 333(a)(2).

The ClariVein Catheter

29.   At all times relevant to this First Superseding Indictment, the device used in the endomechanical vein ablation procedure was known commercially as the ClariVein catheter and was manufactured by Vascular Insights, LLC, which shipped the ClariVein catheters from warehouses located in Massachusetts and Connecticut.

30.   At all times relevant to this First Superseding Indictment, the ClariVein catheters were devices under the FDCA, 21 U.S.C. § 321(h), because they were intended for the infusion of physician-specified agents in the peripheral vasculature, and they did not achieve their primary intended purposes through chemical or metabolic action.   In 2008, the FDA provided clearance that enabled Vascular Insights to market the ClariVein catheter as a single-use, disposable catheter.

31.   At all times relevant to this First Superseding Indictment, the ClariVein catheter's Instructions for Use ("IFUs") stated that the device was for single use only.   The IFUs instructed providers not to reuse, reprocess or resterilize the ClariVein catheter due to the risk of compromised structural integrity of the device and/or device failure, which, in turn, may have resulted in patient injury, illness or death. According to the IFUs, reuse, reprocessing or resterilization could have created a risk of contamination of the device and/or caused patient infection or cross-infection.   The IFUs warned that contamination of the device could lead to injury, illness or death of the patient.   The IFUs instructed providers to dispose of the product and packaging after use.

32.   Beginning no later than in or around February 2016, and continuing through in or around October 2016, in Riverside County, within the Central District of California, and elsewhere, defendant LEE, with intent to defraud and mislead, did, and willfully caused others to do, acts with respect to devices, namely, the ClariVein catheter, after shipment in interstate commerce and while held for sale, which resulted in the devices being adulterated, in that the devices were prepared, packed, and held under insanitary conditions whereby they may have been contaminated with filth, and whereby they may have been rendered injurious to health.

33.   Specifically, defendant LEE adulterated, and caused to be adulterated, ClariVein catheters as follows:

a.   During the endomechanical vein ablation procedures performed by and under the direction of defendant LEE, the ClariVein catheters were contaminated with debris, such as human blood, plasma, and platelets.   This debris remained in the ClariVein catheter after the catheters were removed from the patients.

b.   After performing endomechanical vein ablation procedures on certain patients using the ClariVein catheter, rather than disposing of the ClariVein catheters, defendant LEE repackaged the ClariVein catheters in blue plastic "peel packs" at both the Temecula Clinic and the Blythe Clinic for re-use on the same patient at a later date.

c.   Defendant LEE ignored product use specifications and placed his patients at risk by re-packaging and re-using ClariVein catheters designed for single use only.

COUNT NINE

[18 U.S.C. § 152(3)]

34. The Grand Jury hereby repeats and alleges paragraphs 16-19 of this First Superseding Indictment as if fully set forth herein.

A.   BANKRUPTCY PROCEEDINGS

35. At all times relevant to this First Superseding Indictment, a bankruptcy case was commenced by the filing of a petition in bankruptcy.  The person or entity seeking relief from debts was referred to as the "debtor."

36. At all times relevant to this First Superseding Indictment, the filing of a bankruptcy petition created a "bankruptcy estate" consisting of all property and assets in which the debtor had any ownership or interest when the petition was filed.  The "bankruptcy estate" was administered by a court-appointed trustee.

37. On or about September 24, 2013, defendant LEE and his wife filed and caused to be filed a bankruptcy petition under Title 11 of the United States Code entitled "In re Donald Woo Lee, et al.," case number 13-17920-ES, in the United States Bankruptcy Court for the Central District of California (the "personal bankruptcy").

38. On or about November 18, 2013, defendant LEE filed and caused to be filed a bankruptcy petition under Title 11 of the United States Code on behalf of Prime Partners entitled, "In re Prime Partners Medical Group, Inc.," case number 13-19404-ES, in the United States Bankruptcy Court for the Central District of California (the "corporate bankruptcy").

39.   On or about May 23, 2014, the bankruptcy court entered an order substantively consolidating the corporate bankruptcy with the personal bankruptcy estates (as consolidated, the "Estate").

40.   In or about January 2015, an agent retained by the court-appointed trustee administering the Estate determined that Prime Partners had issued a $252,000 payment for "catheters." When the agent asked defendant LEE for the invoice supporting this $252,000 payment, defendant LEE responded that this catheter purchase was made on the "black market."

41.   The trustee determined that the $252,000 payment was a check made payable to CW-1 on July 25, 2014 from Rabobank Account 1, and was an unauthorized post-petition transfer under Title 11, United States Code, Section 549.

42.   The trustee negotiated a settlement with defendant LEE and CW-1 whereby defendant LEE agreed to remit $86,000 (the "LEE Payment") and CW-1 agreed to remit $166,000 to the trustee on behalf of the Estate, and defendant LEE agreed to submit a declaration under penalty of perjury disclosing the source of the LEE Payment.

B.   FALSE DECLARATIONS

43.   On or about July 27, 2015, in Riverside County, within the Central District of California, defendant LEE knowingly and fraudulently made materially false statements under penalty of perjury in relation to a case under Title 11 of the United States Code, in that he made a declaration under penalty of perjury disclosing the source of the LEE Payment used to repay the Estate (the "LEE Declaration"), in which defendant LEE made

18

the following false statements:

      a.    In paragraph 5 of the LEE Declaration, defendant LEE stated, "In order to fund the [LEE] Payment, I obtained three (3) loans, one from Ms. Amy Kim, one from Ms. Bernadette Roman, and one from Mr. Mike Kim"; whereas in truth and in fact, as defendant LEE then well knew, Ms. Kim and Ms. Roman did not loan defendant LEE money, rather defendant LEE wrote a check for $20,000 from Pacific Western Account 2 made payable to Yong Mi Kim (also known as "Amy Kim"), and a check for $20,000 from Rabobank Account 2 made payable to Bernadette Roman, and asked both Ms. Kim and Ms. Roman to deposit these checks into their personal bank accounts and remit cashiers' checks to defendant LEE, which cashiers' checks defendant LEE used to fund the LEE Payment.

      b.    In paragraph 10 of the LEE Declaration, defendant LEE stated, "None of the funds used in the [LEE] Payment came from myself, my wife, [Prime Partners], or any other corporate entity that I have either have an ownership in, and/or am an officer, director or employee of"; whereas in truth and in fact, as defendant LEE then well knew, defendant LEE wrote a check for $20,000 from Pacific Western Account 2, a corporate bank account for SD Medical Clinic, a corporation owned and operated by defendant LEE, made payable to Yong Mi Kim (also known as "Amy Kim"), and a check for $20,000 from Rabobank Account 2, a corporate bank account for DWL Corp., a corporation owned and operated by defendant LEE, made payable to Bernadette Roman, and asked both Ms. Kim and Ms. Roman to deposit these checks into their personal bank accounts and remit cashier's checks to

1    defendant LEE, which cashiers' checks defendant LEE used to fund

2    the LEE Payment.

FORFEITURE ALLEGATION

[18 U.S.C. §§ 982(a)(7), 981(a)(1)(C) and

28 U.S.C. § 2461(c)]

44.   Pursuant to Rule 32.2(a) Fed. R. Crim. P., notice is hereby given to defendant DONALD WOO LEE, M.D., also known as ("aka") "Donald Lee," aka "Donald Woolee" ("LEE"), that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction under any of the Counts One through Seven and Count Nine of this First Superseding Indictment.

45.   Defendant shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense set forth in any of Counts One through Seven or Count Nine of this First Superseding Indictment; and

b.   A sum of money equal to the total value of the property described in subparagraph a.

46.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of a defendant, the property described in the preceding paragraph, or any portion thereof

21

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

_____
Foreperson

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

JOSEPH BEEMSTERBOER
Deputy Chief, Fraud Section
United States Department of Justice

DIIDRI ROBINSON
Assistant Chief, Fraud Section
United States Department of Justice

ALEXIS GREGORIAN
Trial Attorney, Fraud Section
United States Department of Justice