TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXIS D. GREGORIAN
Assistant Chief
EMILY Z. CULBERTSON (CA Bar No. 282560)
Trial Attorney
United States Department of Justice
Fraud Section, Criminal Division
     300 North Los Angeles Street, Suite 2001
     Los Angeles, California 90012
     Telephone: (202) 768-1172
     E-mail:     alexis.gregorian@usdoj.gov
                 emily.culbertson@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:16-CR-00415-GW |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| DONALD WOO LEE,<br>  aka "Donald Lee,"<br>  aka "Donald Woolee," | Hearing: April 28, 2022<br>Time: 8:00 a.m.<br>Courtroom: 9D |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel
of record, the Fraud Section of the United States Department of
Justice, hereby files its Sentencing Memorandum with respect to
defendant Donald Woo Lee.

     This Sentencing Memorandum is based upon the attached memorandum
of points and authorities, the files and records in this case, the
revised Presentence Investigation Report ("revised PSR"), and such

1   further evidence and argument as the Court may permit at the

2   sentencing hearing.

3    Dated: April 14, 2022             Respectfully submitted,

4                                      TRACY L. WILKISON
                                       United States Attorney
5
                                       SCOTT M. GARRINGER
6                                      Assistant United States Attorney
                                       Chief, Criminal Division
7
                                       _____/s/_____
8                                      ALEXIS D. GREGORIAN
                                       EMILY Z. CULBERTSON
9                                      Criminal Division, Fraud Section
                                       United States Department of Justice
10
                                       Attorneys for Plaintiff
11                                     UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION.................................................1

II.  OFFENSE CONDUCT.............................................2

      1.   Defendant Donald Woo Lee...........................2

      2.   Venous Insufficiency and Vein Ablation.............3

      3.   Medicare Coverage of Vein Ablation Procedures........4

      4.   Defendant Performed Medically Unnecessary Vein
         Ablation Procedures on his Patients.................5

      5.   Patient Testimony..................................8

      6.   Upcoding for Vein Ablation Claims to Medicare......10

      7.   Reuse and Storage of Single-Use ClariVein
         Catheters..........................................14

      8.   False Statements in Bankruptcy.....................17

III. POST-CONVICTION CONDUCT....................................21

IV.  GUIDELINES CALCULATION.....................................23

    A.   Loss Amount......................................24

      1.   Legal Standard....................................24

    B.   Federal Health Care Offense......................27

    C.   Abuse of a Position of Trust.....................27

V.   RESTITUTION................................................29

    A.   The Court Must Order Restitution in this Case............29

    B.   Restitution Is Due and Payable Immediately, but
      Defendant May Pay According to the Recommended
      Schedule While the Government Pursues Other Avenues to
      Satisfy the Restitution Order....................31

VI.  ANALYSIS OF THE SECTION 3553(a) FACTORS....................33

    A.   Nature and Circumstances of the Offenses.................34

    B.   History and Characteristics of the Defendant............35

C.   Deterrence, Promoting Respect for the Law, and
          Punishing Defendant for His Crimes........................37

VII. CONCLUSION....................................................38

1

<u>**TABLE OF AUTHORITIES**</u>

<u>CASES</u>

2

3  United States v. Agbu,
       640 Fed. App'x 613 (9th Cir. 2016)...........................25

4  United States v. Booker,
       543 U.S. 220 (2005).......................................33

5

6  United States v. Bryant,
       128 F.3d 74 (2d Cir. 1997)................................27

7  United States v. Carty,
       520 F.3d 984 (9th Cir. 2008)..............................33

8

9  United States v. Gunning,
       339 F.3d 948 (9th Cir. 2003)..............................32

10 United States v. Hawkins,
       392 F. Supp. 2d 757 (W.D. Va. 2005).......................32

11

12 United States v. James,
       312 F. Supp. 2d 802 (E.D. Va. 2004).......................32

13 United States v. Koenig,
       952 F.2d 267(9th Cir. 1991)...............................26

14

15 United States v. Laurienti,
       731 F.3d 967 (9th Cir. 2013)..............................28

16 United States v. Martin,
       278 F.3d 988 (9th Cir. 2002)..............................29

17

18 United States v. Popov,
       742 F.3d 911 (9th Cir. 2014)..............................25

19 United States v. Ross,
       310 F. App'x 160 (9th Cir. 2009)..........................29

20

21 United States v. Scrivener,
       189 F.3d 944(9th Cir. 1999)...............................27

22 United States v. Serrano,
       234 Fed. Appx. 685 (9th Cir. 2007)........................25

23

24 United States v. Shepherd,
       171 Fed. App'x. 611 (9th Cir. 2006).......................25

25 United States v. Walter-Eze,
       869 F.3d 891 (9th Cir. 2017)..............................25

26

27

28

iii

**STATUTES**

18 U.S.C. § 1347.................................................1, 30

18 U.S.C. § 152(3)...........................................1, 17, 21

18 U.S.C. § 3553.....................................33, 34, 35, 38

18 U.S.C. § 3555................................................33

18 U.S.C. § 3572................................................29

18 U.S.C. § 3663A...............................................30

18 U.S.C. § 3664.....................................29, 30, 31, 32

**MISCELLANEOUS**

15 C.C.R. § 3999.325............................................22

U.S.S.G. § 2B1.1.....................................24, 25, 26, 27

U.S.S.G. § 2F1.1................................................26

U.S.S.G. § 3B1.......................................24, 27, 28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3     On October 16, 2019, a jury found defendant Donald Woo Lee

4 ("defendant") guilty of seven counts of health care fraud, in

5 violation of Title 18, United States Code, Section 1347, and one

6 count of adulteration of a medical device, in violation of Title 21,

7 United States Code, Sections 331(k), 333(a), and 351(a)(2)(A), as

8 charged in a June 7, 2018 superseding indictment (Dkt. 38, 147).  The

9 United States Probation Office ("USPO") issued its Presentence

10 Investigation Report on February 6, 2020.  (Dkt. 163.)  On March 2,

11 2020, defendant pleaded guilty to one count of false declarations in

12 a bankruptcy proceeding, in violation of Title 18, United States

13 Code, Section 152(3), which was also charged in the June 7, 2018

14 superseding indictment.  (Dkt. 167.)  The USPO issued a revised PSR

15 on May 4, 2020.  (Dkt. 174 ["revised PSR"].)  The government filed

16 its objection to the revised PSR on May 18, 2020.  (Dkt. 175.)

17     Defendant's sentencing was continued numerous times between

18 March 2020 and January 2022.  During that time, defendant had been

19 ordered to stop practicing medicine and surrender his license.

20 Nevertheless, defendant continued to practice medicine by offering

21 and performing invasive procedures on patients and sold foreign

22 unapproved products for use on patients.  As a result, the government

23 moved this Court to remand defendant to custody.  The Court found

24 defendant in violation of his bond and ordered him detained.  (Dkt.

25 207.)  Defendant entered custody on February 3, 2022.

26     For the reasons set forth below, and consistent with the revised

27 PSR, the government respectfully submits that the Court should find

28 that the total offense level for defendant is 31.  Based on the

finding in the revised PSR that defendant is in criminal history category I, the resulting advisory guidelines range is 108-135 months.  The government submits that a sentence of 120 months of imprisonment, followed by three years of supervised release, a restitution order of $4,587,533.79, and a special assessment of $900 is sufficient, but not greater than necessary, to provide just punishment in this case, promote respect for the law, and deter defendant and others from committing similar crimes in the future.

## II.  OFFENSE CONDUCT

The Court is no doubt familiar with the facts of this case, having presided over the trial of defendant in October 2019. Nevertheless, given the intervening years between defendant's trial conviction and sentencing, a detailed review of the facts in this case is set forth below.

### 1.    Defendant Donald Woo Lee

According to the evidence, defendant was an internal medicine physician who owned, operated, and oversaw several medical clinics in the greater Los Angeles area, including in Temecula, Mira Loma, Hemet, and Blythe, California. (Trial Tr. 457:23-458:19 (testimony of Donna Knobloch).[1]) Defendant admitted that he enrolled as a Medicare provider from 2012 to 2016 and agreed not to knowingly present or cause to be presented a false or fraudulent claim for payments by Medicare; and not to submit claims with deliberate ignorance or with reckless disregard for their truth or falsity. (Trial Tr. 1346:4-14 (testimony of Donald Woo Lee.)  Defendant also knew he could only

---

[1] The Trial transcripts are available on CM/ECF as Dkt. Nos. 150 (pgs. 1-134); 124 (pgs. 135-296); 152 (pgs. 297-430); 125 (pgs. 431-603); 154 (pgs. 604-667); 126 (pgs. 668-815); 156 (pgs. 816-953); 127 (pgs. 954-1134); 158 (1135-1374); and 160 (pg. 1375-1488).

2

1  submit claims for medically necessary services, and that he was

2  responsible for all Medicare claims.  (Trial Tr. 1346:15-1347:2.)

3  Defendant also agreed to submit claims that were accurate, complete,

4  and truthful.  (Trial Tr. 1347:3-5.)

5      Beginning in or around August 2012, Lee started submitting

6  claims to Medicare for vein ablation procedures.  (See Trial Tr.

7  1192:23-25 (testimony of SSA Kelly Berwanger).) Between August 2012

8  and August 2015, defendant billed Medicare approximately $12,476,350

9  for vein ablation procedures and ultrasound codes, and was paid

10 $4,587,533 as a result.  (Trial Tr. 1193:4-8.)

11          2.   Venous Insufficiency and Vein Ablation

12     As the government's medical expert, Dr. Steven Zimmet testified

13 at trial that vein ablation is a treatment for incompetent saphenous

14 veins.  (Trial Tr. 755:18-20 (testimony of Dr. Steven Zimmet).)

15 There are various treatments available for venous insufficiency in

16 saphenous veins.  Treatment is elective; venous insufficiency is

17 neither life-threatening nor limb-threatening.  (Trial Tr. 754:7-19.)

18 There are both conservative and procedural treatment options.

19 Conservative treatments include graduated medical compression

20 stockings, exercises, leg elevation, and sometimes losing weight,

21 whereas vein ablation is the typical procedural treatment for

22 incompetent saphenous veins.  Vein ablation means closing or sealing

23 off the incompetent vein so the blood doesn't pool and instead re-

24 routes through other, normal veins.  (Trial Tr. 754:20-756:1.)

25     There are several types of vein ablation methods, but the method

26 most relevant to this case is mechanical-chemical ablation, or

27 "MOCA."  In this method, a catheter is inserted into the incompetent

28 vein and a chemical agent, known as sclerosant, is delivered into the

1   vein through a rotating wire.  Together, the sclerosant and rotating

2   wire seal the incompetent vein.  The device that performs this MOCA

3   method is marketed under the commercial name "ClariVein."  (Trial Tr.

4   756:2-14.)  The ClariVein device is a single-use device, meaning it

5   should be disposed of after use. This is stated in ClariVein's

6   instructions for use and is also printed on the box the ClariVein

7   devices arrives inside.  (Trial Tr. 759:5-12.)

8       Vein ablation is not always appropriate for patients with

9   incompetent saphenous veins; there are several contraindications.  If

10  a patient cannot walk well, vein ablation is not advised because it

11  places the patient at high risk for a blood clot.  Vein ablation is

12  also contraindicated if the patient has significant peripheral

13  arterial disease (known as "PAD"), has an infection in the area, or

14  is allergic to the sclerosant.  (Trial Tr. 770:6-77:7.)

15          3.   Medicare Coverage of Vein Ablation Procedures

16      As demonstrated by the evidence introduced at trial, Medicare

17  covers vein ablation procedures in certain circumstances only.

18  Medicare will cover vein ablation procedures only if the procedure is

19  actually provided and if there are significant symptoms.  Medicare

20  does not cover vein ablation procedures if they are cosmetic only.

21  (See Trial Tr. 271:2-4 (testimony of Shannon Bartlett); 772:5-13

22  (testimony of Steve Zimmet, MD).)

23      Medicare's coverage of vein ablation procedures during the

24  relevant time period (2012-2015) was set forth in documents called

25  Local Coverage Determinations ("LCDs").  (Trial Tr. 273:1-21

26  (testimony of Shannon Bartlett); Ex. A (Gov. Exs. 401-402[2]).)

27

28

[2] "Gov. Ex." refers to the government trial exhibit number.

4

1  According to these LCDs, in order for Medicare to consider vein

2  ablation medically necessary, a patient had to have the following

3  symptoms: (a) an ulcer in their leg, (b) pain or edema that would

4  interfere with their activities of daily living, such as dressing or

5  doing housework, (c) bleeding associated with the veins, (d)

6  recurrent phlebitis, which is irritation of the lower legs, or (e)

7  edema or swelling of the legs that does not go away.  (Trial Tr.

8  274:22-275:20); Ex. A (Gov. Exs. 401-402).)  Medicare required that

9  these symptoms be documented in a patient's medical record and even

10  if a patient had one of these symptoms documented, Medicare still

11  required that the patient try conservative treatment before Medicare

12  would cover vein ablation. (Trial Tr. 276:5-11.)  According to the

13  LCDs, conservative treatment included weight reduction, daily

14  exercise, elevation of the leg, and compression stockings for a

15  period of 6-8 weeks.  This conservative treatment had to have failed

16  and also be documented in the patient's record before Medicare would

17  consider vein ablation medically necessary.  (Trial Tr. 276:14-

18  277:18.)

19          4.   Defendant Performed Medically Unnecessary Vein
                Ablation Procedures on his Patients
20

21      Defendant set up one of his clinics in a senior living community

22  in Mira Loma, California.  (Trial Tr. 1206:18-1207:2 (testimony of

23  SSA Kelly Berwanger).)  Defendant performed vein ablation procedures

24  on 49 of the Medicare patients in this senior living community alone.

25  (Trial Tr. 1207:6-12); Ex. B (Gov. Ex. 1214).)  Defendant not only

26  performed vein ablations on many patients, but also performed many

27  ablations on each patient.  Agent Berwanger testified that among all

28  the patients who received vein ablations, 83% received more than one

5

1   ablation, and 51% of the patients received four or more vein

2   ablations.  (Trial Tr. 1196:16-1197:25.)  The average number of

3   ablations defendant gave to each patient was 3.7 procedures.  (Trial

4   Tr. 1198:1-3.)

5       Agent Berwanger testified at trial that when she and a team of

6   agents executed a search warrant at defendant's Temecula office, they

7   seized the medical records of Medicare patients to whom defendant had

8   provided vein ablations.  (Trial Tr. 1175:15-1176:7.)  From these

9   files, the case agents randomly selected 35 patients (amounting to

10  approximately 10% of the total pool of 333 patients).  (Trial Tr.

11  1176:23-1177:13.)  The medical records of these 35 patients were then

12  provided to Dr. Zimmet, along with the seven additional patients who

13  had been previously interviewed during the investigation, including

14  Patricia Chastain, Sam Meek, Cosmas Castille, Flossie Smalley, and

15  Christine Bronson.  (Trial Tr. 1177:14-18; 1176:2-3.)

16      Dr. Zimmet testified about his review of these 42 patients'

17  medical files. (Trial Tr. 789:8-18.)  Based on his review, Dr. Zimmet

18  concluded that the vein ablation procedures defendant performed on

19  these patients and billed to Medicare were neither medically

20  necessary under Medicare's guidelines nor within the standard of

21  care.  (Trial Tr. 789:19-790:9.)

22      Moreover, in reviewing the number of veins defendant ablated in

23  each of these 42 patients compared to several study results published

24  in well-regarded, peer-reviewed medical journals, it was clear that

25  defendant performed many more vein ablations on his patients than was

26  typical in the field.  (Trial Tr. 791:25-797:13.)  For example, one

27  study examined over 340,000 Medicare patients across 10,000 medical

28  providers and across that large number of Medicare patients, there

1    was an average of 1.8 vein ablation per patient.  In comparison, of

2    the 42 patient files that Dr. Zimmet reviewed, defendant performed an

3    average of 4.2 ablations per patient—that is, more than double the

4    average number of ablations in the study.  (Trial Tr. 793:24-794:19.)

5        With respect to the five patients listed in the indictment, Dr.

6    Zimmet found that none of them had documented reflux in their patient

7    files and that many of them had contraindications—reasons that vein

8    ablations should not be performed on those patients.  (Trial Tr.

9    831:10-16 (Sam Meek); 831:3-22 (Christine Bronson); 843:7-24 (Cosmas

10   Castille); 854:15-855:3 (Patricia Chastain); 862:11-863:13 (Flossie

11   Smalley).)  Indeed, Dr. Zimmet pointed out that for some of these

12   patients, vein ablation was contraindicated because the surgery was

13   elective and the patients' health was too weak to support providing

14   elective surgery.  (Trial Tr. 808:20-25; 809:16-25; 847:5-19; 866:5-

15   13.)  Dr. Zimmet also noted that the medical records of several of

16   these patients reflected that the patients suffered pain as a result

17   of the unnecessary vein ablations that defendant provided.  For

18   example, Mr. Castille's patient record reflected a few weeks after

19   his vein ablation he complained of "pain, stiffness in both legs ever

20   since the procedure, ankle to his knees, most of the time it's 10 out

21   of 10 pain."  (Trial Tr. 852:17-853:15.)  Despite this "worst

22   imaginable pain," Dr. Lee performed additional unnecessary vein

23   ablation procedures on Mr. Castille two weeks later.  (Trial Tr.

24   853:11-24.)  Ms. Flossie Smalley's medical record indicated that she

25   was afraid to do the procedure.  (Trial Tr. 871:23-872:6.)  She was

26   treated for a surgical wound after defendant gave her a vein

27   ablation, and received additional ablations from defendant after

28   that.  (Trial Tr. 877:20-878:22.)  The records also supported that

Ms. Smalley received a nerve injury from one of the many ablations defendant gave her, causing a "shocking feeling" that made "her whole leg jump." (Trial Tr. 879:2-880:6.) Even after this issue, defendant wanted to schedule more ablations on Ms. Smalley. (Trial Tr. 880:22-881:19.)

Agent Berwanger also testified that Medicare conducted a medical review of the medical records seized from defendant's Temecula office. (Trial Tr. 1178:13-24.) Medicare contractor Safeguard Services ("SGS") performed a medical review of the medical records for 95 randomly-selected patients among those that received vein ablation from defendant. (Ex. C.) This medical review found that 100% of the claims would have been denied because in many instances the documentation in the medical records did not support that the patients needed vein ablation, and in other instances, defendant used CPT code of 37241 when he should have used the code for vein ablation. (Id. at 1, 2, 4.)

5.   Patient Testimony

As further described below, Medicare beneficiaries Flossie Smalley, Christine Bronson, and Patricia Chastain testified at trial that they did not have varicose veins, yet defendant recommended that each of them get multiple vein ablations without first recommending that they try conservative care. The parties also stipulated to the testimony of Medicare beneficiaries Sam Meek and Cosmas Castille. Several of these beneficiaries experienced pain as a result of the unnecessary vein ablations defendant performed on them, yet defendant callously continued to perform and/or recommend additional vein ablations.

Flossie Smalley testified that she has never had varicose veins, and that defendant recommended vein ablation to help her with neuropathy. (Trial Tr. 348:9-17.) Defendant did not recommend any conservative treatments before she received the ablations. (Trial Tr. 347:24-348:4.) Defendant asked Ms. Smalley to get vein ablation "[m]any, many times," but Ms. Smalley was fearful of the treatment. (Trial Tr. 349:12-20.) Defendant ablated seven or eight veins on Ms. Smalley. (Trial Tr. 351:13-19.) After one of the ablations, she got a painful infection. (Trial Tr. 352:10-16.) One of the ablations caused Ms. Smalley to have a nerve injury which felt like "electrical shocks." (Trial Tr. 353:13-20.) Defendant gave her methadone to treat the nerve injury which caused her to sleep for two days. (Trial Tr. 354:5-18.) The "painful electrical shocks" still affected her years later. (Trial Tr. 355:7-16.) Ms. Smalley also submitted a victim statement for sentencing, which is attached hereto as Exhibit D. According to Ms. Smalley's victim statement, "it took [defendant] a year to persuade me to accept his procedures when I did not have a clear sign it was needed. This aggression was unnecessary, I am daily continuously suffering as a result . . . ." (Ex. D at 2.)

Christine Bronson testified that she did not have any bulgy twisty veins, and that defendant never recommended any conservative treatment before ablating her veins. (Trial Tr. 366:8- 369:18; 370:25-731:14.) Ms. Bronson also testified that she was surprised when she received an explanation of benefits from Medicare that defendant charged $17,800 for a 30-minute procedure particularly because she had just had a multi-hour shoulder replacement surgery which cost $5,000. When she asked defendant why he charged so much,

1  he said that if "he didn't bill this kind of bill, that he wouldn't

2  get paid what he needed to."  (Trial Tr. 376:10-378:10.)

3        Patricia Chastain testified that she did not have any varicose

4  veins when she went to see defendant.  (Trial Tr. 395:3-7.)  She felt

5  that defendant was impatient with her.  (Trial Tr. 400:4-9.)  Ms.

6  Chastain testified that, after the procedure, she had a knot develop

7  above her knee and went to her primary care physician, Dr. Matthias,

8  to get it checked out.  (Trial Tr. 403:10-19.)  Dr. Matthias

9  testified that he examined both legs and they looked fine, so he told

10 Ms. Chastain not to get any more procedures done for varicose veins.

11 (Trial Tr. 419:15-24; 422:1-5.)

12        The parties stipulated that Sam Meek would have testified that

13 he never had varicose veins, and that defendant never recommended any

14 conservative treatment options such as compression stockings or leg

15 elevation, and that defendant performed four ablations on Mr. Meek.

16 (Trial Tr. 585:6-586:1.)

17        The parties also stipulated that Cosmas Castille would have

18 testified that defendant did not recommend any conservative care

19 treatment options and performed two vein ablations on Mr. Castille.

20 After the ablations, Mr. Castille had a lot of trouble with his leg

21 including swelling and cramping.  (Trial Tr. 583:7-584:20.)

22             6.   Upcoding for Vein Ablation Claims to Medicare

23        In medical billing, there is a set of codes that medical

24 providers use to submit claims to insurance providers like Medicare.

25 These are referred to as current procedural terminology ("CPT")

26 codes.  The American Medical Association promulgates this set of

27 codes in a CPT Code Manual and updates them on a yearly basis.

28 (Trial Tr. 281:7-282:6 (testimony of Shannon Bartlett).)

1    The evidence introduced at trial demonstrated that defendant

2    knowingly used the incorrect CPT code to bill Medicare for ClariVein

3    procedures in order to receive a higher reimbursement than that to

4    which he was entitled.  CPT Code 37241 was introduced in the CPT Code

5    Manual in January 2014 to bill for vascular embolization and

6    occlusion procedures.  (Ex. E (Gov. Ex. 404).)  Vascular embolization

7    or occlusion typically involves the installation of a coil or a plug

8    into a vein.  It's done in a specialized setting and it is not done

9    on saphenous veins.  Moreover, ClariVein is not vascular embolization

10   or occlusion.  (See Trial Tr. 790:15-18 (testimony of Steve Zimmet,

11   MD); Trial Tr. 1077:16-1078:3 (testimony of Adam Saltman, MD).)

12   Defendant was made aware that CPT code 37241 was an

13   inappropriate code to use for ClariVein on five separate occasions

14   throughout 2014 and 2015.  First, defendant received an email in

15   March 2014 two months after code 37241 came out.  The email had an

16   attachment that stated that the American Medical Association said

17   that for ClariVein procedures, code 37799, not code 37241 should be

18   billed.  (Ex. F (Gov. Ex. 503).)  Defendant clearly opened and

19   reviewed this email because he forwarded it.  Nevertheless, defendant

20   kept billing Medicare using code 37241.  He billed Medicare over

21   $11.3 million using code 37241 following this email. (Trial Tr.

22   1220:12-1221:22 (testimony of SSA Kelly Berwanger); Ex. G (Gov. Ex.

23   1232).)

24   Second, in April 2014, a coding alert was issued by Medicare.

25   This coding alert made clear that code 37241 "must not be used to

26   bill" Medicare for ClariVein vein ablation procedures.  Defendant

27   continued to use code 37241 to submit claims to Medicare, billing

28   close to $11 million with code 37241 after this coding alert came

11

1  out.  (Trial Tr. 1221:23-1222:22; Ex. F (Gov. Ex. 503), Ex. H (Gov.
2  Ex. 1233).)

3       Third, in November 2014, defendant received an email from Geoff
4  Heldoorn, a salesman who sold ClariVein catheters to defendant, that
5  included as an attachment an article from CPT Assistant.  That
6  article said code 37799 should be used to bill for ClariVein and that
7  it is "incorrect" to use code 37241.  Defendant continued to bill
8  Medicare another $6.5 million for ClariVein procedures using the
9  wrong code, 37241.  (Trial Tr. 1222:23-1223:20; Ex. I (Gov. Ex. 504),
10  Ex. J (Gov. Ex. 1234).)

11      Fourth, in January 2015, defendant was forwarded an email
12  containing Medicare's position regarding the use of code 37241 to
13  bill Medicare for ClariVein.  The email said not to bill CPT 37241
14  for the ClariVein procedure.  Defendant still billed Medicare close
15  to $5.8 million using the wrong code, 37241, after he received this
16  email.  (Trial Tr. 1223:21-1225:1; Ex. K (Gov. Ex. 505), Ex. L (Gov.
17  Ex. 1235).)

18      Finally, in October 2015, Medicare issued a revised LCD,
19  specifically stating that ClariVein should be billed using code
20  36299.  Following the issuance of this LCD, defendant billed Medicare
21  another $2.5 million for ClariVein using the wrong code, 37241.
22  (Trial Tr. 1225:2-15; Ex. M (Gov. Ex. 403), Ex. N (Gov. Ex. 1236).)

23      Defendant billed Medicare approximately $8,900 for every
24  ClariVein procedure he billed using CPT code 37241.  By comparison,
25  he billed Medicare approximately $3,000 for a similar procedure, vein
26  ablation using radiofrequency.  (Ex. O (Gov. Ex. 1206); Trial Tr.
27  1200:8-14.)  Defendant was an outlier in the Medicare data for his
28  use of code 37241. Compared to the 3,600 medical providers nationwide

who submitted claims to Medicare using code 37241, defendant was number two in the country and number one in California.  In total, between January 2014 and December 2016, defendant billed Medicare over $13,500,000 using code 37241.  (Trial Tr. 1201:15-1203:7; Ex. P (Gov. Ex. 1208).)

This was not defendant's first experience with fraudulent upcoding.  The government introduced at trial an Accusation and Stipulated Settlement between defendant and the California Medical Board.  (Trial Tr. 1226:10-25; Ex. Q (Gov. Ex. 1101).)  The Accusation alleged that defendant performed nonsurgical laser vein removal procedures on over 20 patients, but fraudulently billed Medicare using CPT Codes 36478 and 36479 and received over $35,000 in excess Medicare reimbursements as a result.  (Trial Tr. 1227:2-25; Ex. Q (Gov. Ex. 1101).)  The Accusation also alleged that defendant's employee Tanya Uribe showed defendant a printout that he had billed Medicare using the wrong code, defendant looked at the printout and threw it in the trash.  (Trial Tr. 1228:2-10.)  The Accusation continued that defendant later falsely told the Medical Board that he did not realize he used the wrong codes, and never did return any portion of the excess payments he received as a result of using the wrong codes.  (Trial Tr. 1228:21-1229:14.)  In September 2012, defendant signed a stipulation that he read and understood the charges and allegations in the Accusation and that he understood if the charges were proven at the hearing would constitute cause for discipline on his physician's license.  (Trial Tr. 1231:5-1232:3.) Ms. Uribe also testified at trial that while she was working at defendant's medical practice from 2003 to 2007, she discovered that defendant was billing for vein ablation when he was really providing

1    laser vein treatments.  (Trial Tr. 434:18-25, 437:2-438:22.)  Ms.

2    Uribe testified that she informed defendant that he had been using

3    the wrong code and handed him a printout regarding the codes.  (Trial

4    Tr. 438:21-439:13.)  In response, defendant told her, "don't fucking

5    worry about it," and tossed the printout in the trash.  (Trial Tr.

6    439:19-440:22.)

7          7.   <u>Reuse and Storage of Single-Use ClariVein Catheters</u>

8      Special Agent Berwanger testified at trial that when she and a

9    team of agents executed a search warrant at defendant's Temecula

10    office, they took a photograph of used vein catheters gathered in a

11    storage room of defendant's office.  (Trial Tr. 1173:2-15; Ex. R

12    (Gov. Ex. 803).)

13      Ultrasound technician Virginia Ratcliff testified that she

14    worked with defendant when he conducted vein ablation procedures, and

15    that in June 2016 she saw defendant flush ClariVein catheters and

16    wipe them down after use.  (Trial Tr. 512:23-513:19.)  Ms. Ratcliff

17    asked defendant why he was doing this, and defendant responded that

18    he was thinking of reusing them on mission trips.  (Trial Tr. 513:20-

19    25.)  Ms. Ratcliff further testified that she saw approximately 100

20    used ClariVein catheters in defendant's office in Blythe, and she saw

21    some again at defendant's office in Temecula and took a picture.

22    (Trial Tr. 514:6-518:4.)  After a procedure in Lake Havasu, defendant

23    asked Ms. Ratcliff to clean the catheters and write a patient's name

24    on the box.  (Trial Tr. 518:5-519:25.)  Ms. Ratcliff then sent

25    defendant an email terminating her business relationship with him

26    because of his reuse of catheters on patients.  (Trial Tr. 520:3-22;

27    Ex. S (Gov. Ex. 903).)  Defendant responded, "I have used the same

28

catheters on same patients, those patients for the free services and cash patients." (Ex. S (Gov. Ex. 903).)

Ultrasound technician Aaron Montijo testified that he worked with defendant on vein ablation procedures. (Trial Tr. 1028:5-19.) Mr. Montijo testified that after defendant used a vein catheter on a patient, defendant often wiped it down with a cloth and took it down the hall. (Trial Tr. 1031:24-1033:13.) Mr. Montijo saw the used catheters in his office on the desk, at least a dozen of them neatly stacked up, side by side. (Trial Tr. 1033:14-18, 1036:2-11.) Mr. Montijo had never seen another doctor save used catheters, because usually they go into a biohazard waste bag to be destroyed. (Trial Tr. 1034:7-13.) Mr. Montijo explained that he asked defendant why he was saving the catheters, and defendant responded that he was going to use them for some mission work in Korea. (Trial Tr. 1036:14-19.)

Geoffrey Heldoorn, a salesman who sold ClariVein catheters to defendant, testified that ClariVein catheters cannot be reused and cannot be sterilized after use. (Trial Tr. 618:1-15.) He testified that the instructions for use made it clear that the ClariVein catheter may not be reused, reprocessed, or re-sterilized because that "may compromise the structural integrity of the device and/or lead to device failure, which in turn may result in patient injury, illness, or death," and may "create a risk of contamination of the device and/or cause patient infection or cross infection, including, but not limited to, the transmission of infectious disease from one patient to another." (Trial Tr. 623:20-624:7.) Mr. Heldoorn testified that defendant joked with him about reusing catheters and Mr. Heldoorn told defendant that the catheters were for single use only. (Trial Tr. 628:8-22.)

1    Mr. Heldoorn further testified that he stopped working with

2    defendant in 2016 when Mr. Heldoorn learned from Virginia Ratcliff

3    that defendant was reusing ClariVein catheters.  (Trial Tr. 629:1-8.)

4    Defendant called Mr. Heldoorn and said that his reuse of the

5    catheters was none of Ms. Ratcliff's business, that defendant was the

6    physician and it was his choice to reuse them.  (Trial Tr. 629:16-

7    25.)  He also stated that he was reusing the catheters for procedures

8    given to patients on whom he had already used the catheters once.

9    (Trial Tr. 630:1-4.)  Mr. Heldoorn also testified that in 2016 he had

10   seen about 20 used catheters in defendant's office, with first and

11   last names written on the exterior.  (Trial Tr. 631:16-632:23, 633:4-

12   6.)  Defendant told Mr. Heldoorn that he was saving the catheters for

13   a mission trip, and that the FDA's rules about sterilization would

14   not apply outside the U.S.  (Trial Tr. 633:7-17.)  Mr. Heldoorn

15   informed defendant that his company would provide free catheters for

16   mission trips, but defendant never took the company up on that offer.

17   (Trial Tr. 633:24-634:25.)

18   Dr. Adam Saltman testified as an expert in FDA approval of

19   medical devices, including the ClariVein device.  (Trial Tr. 1062:9-

20   15.)  Dr. Saltman testified that there is no way to properly

21   sterilize a ClariVein catheter for safe and effective reuse on a

22   patient.  (Trial Tr. 1070:19-22.)  He testified that he would have

23   serious concerns that a reused catheter would not perform properly on

24   reuse, and that bacteria could grow on a used catheter in a

25   nonsterile environment.  (Trial Tr. 1073:6-24.)  Reusing a used

26   catheter could cause bodily harm especially an infection.  (Trial Tr.

27   1073:25-1074:18.)

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

           8.   False Statements in Bankruptcy

     On July 18, 2019, the Court severed Count 9 of the First
Superseding Indictment ("FSI"), charging false declarations in
bankruptcy in violation of 18 U.S.C. § 152(3), from the remaining
charges of the Indictment.  (Dkt. 87.)  After trial as to Counts 1 to
8 of the FSI, on March 2, 2020, defendant pleaded guilty to Count 9.
(Dkt. 167.)

     The government's investigation of Count 9 found the following
facts: On September 24, 2013, defendant and his wife filed for
Chapter 11 bankruptcy on behalf of themselves in the case, In re
Donald Woo Lee, et al., Case No. 8:13-BK-17920-ES (C.D. Cal.).  On
November 18, 2013, defendant filed for Chapter 11 bankruptcy on
behalf of Prime Partners in the case, In re Prime Partner Medical
Group, Inc., Case No. 8:13-BK-19404-ES (C.D. Cal.).  On May 23, 2014,
the bankruptcy court entered an order substantively consolidating
Prime Partners' Chapter 11 proceeding into the defendant's Chapter 11
bankruptcy (as consolidated, the "Estate").  On December 22, 2014,
the bankruptcy court appointment Richard A. Marshack as Chapter 11
Trustee of the consolidated cases.  Marshack retained Lori Ensley of
Bicher & Associates as the field agent to assist in the operations of
Prime Partners.

     In January 2015, Ensley discovered that Prime Partners issued a
$252,000 payment to an unknown source for "catheters" on July 25,
2014.  According to Ensley, this was four to five times the usual
monthly expense for catheters.  When Ensley questioned defendant
about this payment, defendant responded that he used the funds to
purchase catheters on the "black market."  Ensley obtained the check
for the $252,000 payment and determined that the payment had been

                              17

1  issued to Sang Paik, a dentist and family friend of Lee's. (See Ex. T
2  (Ensley Interview Report).)   The trustee determined that Paik used
3  the payment by defendant to make an investment in Genelux, a
4  restricted stock, on defendant's behalf and determined that this
5  payment was an unauthorized post-petition transfer under Title 11,
6  United States Code, Section 549.

7      Following this determination, the trustee negotiated a
8  settlement with defendant and Paik whereby defendant agreed to remit
9  $86,000 and Paik agreed to remit $166,000 to the trustee on behalf of
10  the Estate.   Defendant and Paik also agreed to submit declarations
11  under penalty of perjury disclosing the source of their respective
12  payments.

13      On June 25, 2015, defendant remitted a cashier's check to the
14  Trustee for $86,000 as defendant's settlement payment.   On July 27,
15  2015, defendant signed a declaration, under penalty of perjury, that
16  stated in paragraph 5, "In order to fund the Settlement Payment, I
17  obtained three (3) loans, one from Ms. Amy Kim, one from Ms.
18  Bernadette Roman, and one from Mr. Mike Kim."   (Ex. U (Declaration to
19  Bankruptcy Court).)   Amy Kim (legal name "Yong Mi Kim") is
20  defendant's sister, Bernadette Roman was defendant's employee, and
21  Mike Kim is defendant's relative.

22      Paragraph 10 of the declaration states, "None of the funds used
23  in the Settlement Payment came from myself, my wife, [Prime
24  Partners], or any other corporate entity that I have either have an
25  ownership in, and/or am an officer, director or employee of."   Both
26  paragraphs 5 and 10 contained false declarations.

27      In fact, neither Ms. Kim nor Ms. Roman lent money to defendant.
28  Rather, defendant paid each of them $20,000 from corporate bank

accounts that he owned and asked them to deposit those checks into
their own bank accounts and then remit cashier's checks to defendant.
Specifically, the banking records show that on June 15, 2015,
defendant paid Ms. Kim $20,000 from a Pacific Western corporate bank
account for SD Medical Clinic, which is a corporation owned and
operated by defendant, on which defendant is the sole signatory.
Also on June 15, 2015, defendant paid Ms. Roman $20,000 from a
Rabobank corporate bank account for Donald Woo Lee, A Professional
Corporation, a corporation owned and operated by defendant, on which
defendant is the sole signatory.  On June 25, 2015, Bernadette Roman
and Yong Kim each remitted cashiers' checks to Dr. Donald Lee for
$20,000.

Agents interviewed both Ms. Roman and Ms. Kim, who stated that
they did not loan Lee $20,000.  (Ex. V (Roman Interview Report); Ex.
W (Kim Interview Report).)  Ms. Roman stated that defendant gave her
a check and asked her to get a bank check for his "lawyer," later
identified as Richard Marshack, the Trustee.  Ms. Roman sent the
check to Marshack via certified mail, but it was rejected because Ms.
Roman's name was on the check as the remitter.  Ms. Roman obtained a
new cashier's check to pay the $20,000 to Lee.  According to Ms.
Roman, it was not her money that she remitted to defendant and was
therefore not a loan.  Ms. Kim was also interviewed and brought
before the grand jury where she testified that Lee gave her a $20,000
check and asked her to deposit it and get him a cashier's check.  Ms.
Kim testified this was not a personal loan to Lee.

Accordingly, the $20,000 that defendant received from each of
Ms. Kim and Ms. Roman was not a loan, but money that defendant

himself paid them from corporate entities that he owned.  As such, paragraphs 5 and 10 of Lee's declaration are false.

On February 2, 2018, Paik proffered to the government that he has had a personal friendship with defendant and defendant's family for over 20 years.  (Ex. X (Paik Interview Report).)  Paik explained that in July 2014, Paik met with defendant at a Starbucks and Paik told defendant about an investment opportunity with the company Genelux, an immunotherapy technology company.  Defendant told Paik that he wanted to invest.  Paik knew at the time that defendant was in bankruptcy, but defendant told Paik that the bankruptcy would be over soon and asked Paik to make an investment for defendant in his (Paik's) name.  Defendant wrote Paik a $252,000 check a few days later, Paik deposited the check and then purchased the Genelux stock on about July 28, 2014.

The following year, Paik received a packet in the mail from the Trustee inquiring about the $252,000 check.  Paik asked defendant what was going on.  Defendant told Paik he (defendant) had fabricated a backstory to explain the $252,000 check—the money was for black market catheters.  More specifically, defendant fabricated the following details: Paik's cousin in New York owed Paik $240,000, and the cousin knew someone who was selling catheters on the black market, so instead of repaying Paik, the cousin repaid the debt to Paik by purchasing the black-market catheters for Prime Partners.  Defendant wrote the $252,000 check to Paik to cover the purchase of the black-market catheters.  Assuming that the cousin had delivered the catheters to defendant, Paik made the Genelux investment.  During his proffer, Paik explained this backstory was entirely false.

Paik was not a part of the settlement negotiation with the Trustee regarding the $252,000 payment.  Defendant told Paik that defendant would repay the $166,000 to the Estate that Paik owed under the terms of the settlement agreement.  Paik did not draft his declaration, he received it from defendant's bankruptcy attorney and was told to sign it.  Paik knew that the declaration contained false statements, but he signed it anyway, believing that the money was going to be paid back to the Estate and that this would be behind him.

On December 20, 2018, Paik pleaded guilty to an information, admitting to false declarations in connection with a bankruptcy proceeding in violation of 18 U.S.C. § 152[3] in the case <u>United States v. Sang Paik</u>, 5:18-CR-283-GW (C.D. Cal.).  Paik's sentencing is currently scheduled on May 9, 2022.

At trial, defendant also admitted that he lied to the bankruptcy court about the $252,000 check to Sang Paik for "black market catheters."  (Trial Tr. 1363:3-1365:7.)

**III. POST-CONVICTION CONDUCT**

After trial, the government raised concerns to the Court about defendant's importation of foreign unapproved products after defendant's conviction.  (Trial Tr. at 1483.)  For these and other reasons, the Court ordered defendant to stop practicing medicine as a condition of his release on bond pending sentencing.  (Trial Tr. 1486-87.)  Defendant remained out on bond for two and half years after his conviction due to court closures during the COVID-19 pandemic.  During that time, defendant ignored the Court's order to stop practicing medicine and the government's concerns about his activities with foreign unapproved products.

21

Despite the Court's order, several witnesses told law enforcement that in 2020 and 2021, they saw defendant Lee soliciting patients to receive treatments, performing procedures, and instructing others on how to perform them.  These procedures included thread lift and penis enlargement procedures.  Thread lifts are temporary face lifts in which barbed sutures are used to tighten the skin. A penis enlargement with fillers consists of injecting filler into the penis, by defendant Lee's own description. (Ex. Y at 24, Nov. 23, 2020 Text Message (describing that the procedure will require multiple injections).)  Defendant is unlicensed, so in California he is treated as a "medical assistant" who may only perform "non-invasive routine technical support services."  15 C.C.R. § 3999.325(f) (emphasis added).  Because both the thread lift and penis enlargement procedures pierce the skin, they are invasive, and may not be performed by an unlicensed person. Cf. id. (listing the routine technical support services that may be performed by a medical assistant).  Therefore, defendant was not permitted to perform these procedures both because he was unlicensed and because of the Court's order.

Several witnesses told law enforcement that they saw defendant Lee perform and train others to perform thread lifts. (Ex. Z at 2; Ex. Y at 1, 5-7.)  In addition, defendant's interview was reported in a newspaper article in which he admitted to performing Botox on a patient. Joe Nelson, 'Real Housewives of OC' star had convicted, unlicensed doctor work on her patient, lawsuit claims, Daily Bulletin (Jan. 3, 2022, updated Jan. 4, 2022), available at https://www.dailybulletin.com/2022/01/03/real-housewives-of-oc-starhad- convicted-unlicensed-doctor-work-on-her-patient-lawsuit-

claims (last visited Jan. 17, 2022).  Despite the Court's oral and written orders on October 16 and 17, 2019 that defendant could not practice medicine, defendant has been training other providers on how to conduct invasive procedures such as thread lifts, has been providing thread lifts to patients and has injected at least one person with "Botox."  Defendant has also offered to perform a penile enlargement procedure.  This was in direct contradiction to the Court's order and was unlicensed practice of medicine.

Defendant also imported products from Korea that were not approved for use in the United States and sold them to physicians and doctors' offices for use on patients.  (Ex. AA; Ex. Z at 2-3; Ex. BB at 1; Ex. Y at 2, 39.)

Moreover, defendant actively attempted to avoid the detection of his unlawful and dangerous activities, as demonstrated by defendant's text messages to witness E.G. on September 28, 2021.  (Ex. Y at 46.) Defendant asked E.G. by text message if E.G. could join the messaging application "Telegram."  E.G. asked defendant the purpose of messaging via Telegram and defendant responded, "Telegram is not monitor [sic] by the government."  (Id.)  Defendant was thus clearly aware his activities are unlawful and persisted nonetheless.

## IV.   GUIDELINES CALCULATION

In the revised PSR, the USPO calculated defendant's total offense level as 31, with an advisory guidelines range of 108-135 months.  (Revised PSR ¶ 108.)  The government agrees with the total offense calculation in the revised PSR and respectfully submits that the Court should calculate the guidelines range for defendant as follows:

| | | |
|---|---|---|
| Base Offense Level: | 6 | U.S.S.G. § 2B1.1(a)(2) |
| Loss amount:<br>More than $9.5 million but less<br>than $25 million | 20 | U.S.S.G. §§ 2B1.1(b)(1)(K) |
| Federal Health Care Offense | 3 | U.S.S.G. §2B1.1(b)(7) |
| Abuse of a Position of Trust | 2 | U.S.S.G. § 3B1.3 |

Accordingly, defendant's total offense level should be 31.

**A.  Loss Amount**

The government agrees with the USPO's determination in the revised PSR that a 20-level enhancement applies under U.S.S.G. § 2B1.1(b)(1)(K) based on the intended loss to Medicare of at least approximately $12,476,350.  (Revised PSR ¶¶ 44, 45.)

1.  Legal Standard

Pursuant to the Guidelines, the loss amount "is the greater of actual loss *or* intended loss."  U.S.S.G. § 2B1.1, cmt. n.3(A) (emphasis added).  The intended loss means "the pecuniary harm that defendant purposely sought to inflict; and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur" (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."  Id., cmt. n.3(A)(ii). The Commentary to U.S.S.G. § 2B1.1 states that "[i]n cases in which the defendant is convicted of a Federal health care offense involving a Government health care program [i.e., Medicare], the aggregate dollar amount of fraudulent bills submitted to [Medicare] shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted."  Id., cmt. n.3.F(viii).

The Ninth Circuit and numerous other courts have reached the same conclusion that the amount billed to Medicare is the proper measure of the intended loss under U.S.S.G. § 2B1.1.  See, e.g., United States v. Walter-Eze, 869 F.3d 891, 912 (9th Cir. 2017) ("In health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss for sentencing purposes."); United States v. Agbu, 640 Fed. App'x 613, 616 (9th Cir. 2016) (unpublished) ("[T]he billed amount is prima facie evidence of intended loss . . . ."); United States v. Popov, 742 F.3d 911, 916 (9th Cir. 2014) ("In health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss for sentencing purposes."); United States v. Shepherd, 171 Fed. App'x 611, 615 (9th Cir. 2006) (unpublished) ("Shepherd billed for over $800,000, and thus intended to deprive Medicare of that amount, regardless of how much was actually collected."); United States v. Serrano, 234 Fed. App'x 685, 687 (9th Cir. 2007) (unpublished) ("We hold that the district court properly interpreted § 2B1.1 and that the court did not clearly err when it approximated the intended loss as the amounts Appellant submitted to Medicare and Medi-Cal for reimbursement.").

Both Dr. Zimmet and a Medicare medical reviewer reviewed random samples of defendant's vein ablation medical records and determined that 100% of the vein ablations reviewed did not meet Medicare's coverage criteria.  Dr. Zimmet conducted a review of a random sample of defendant's patient records to determine whether the ablations defendant billed to Medicare met the coverage requirements, and found that 100% of defendant's vein ablation procedures were medically unnecessary and failed to meet Medicare's coverage criteria.  Dr.

1    Zimmet testified that he reviewed the medical records of a total of
2    42 patients on whom defendant performed vein ablation procedures.
3    (Trial Tr. at 746-47.)   These 42 patients included the five patients
4    who are named in the indictment, plus 37 randomly selected patients.
5    (Id. at 789.) In his medical opinion, none of those vein ablation
6    procedures was medically necessary, none was within the standard of
7    care, and none met the Medicare guidelines for coverage.   (Id. at
8    789-90.)   Medicare contractor SGS also conducted a review of 95
9    randomly-selected patients' medical records for defendant's vein
10   ablation patients.   (Ex. C.)   This medical review found that 100% of
11   the claims would have been denied because in many instances the
12   documentation in the medical records did not support that the
13   patients needed vein ablation, and in other instances, defendant used
14   CPT code of 37241 when he could have used the code for vein ablation.
15   (Id. at 1, 2, 4.)

16        The findings of Dr. Zimmet and the Medicare medical review may
17   be extrapolated to the rest of defendant's billings for vein ablation
18   and related procedures.   Under the Sentencing Guidelines, "[t]he
19   court need only make a reasonable estimate of the loss," which "shall
20   be based on available information. . . ."   U.S.S.G. § 2B1.1, cmt. n.
21   3(C).   For example, the Sentencing Guidelines also provide that
22   estimates of loss in fraud cases "may be based on the approximate
23   number of victims multiplied by the average loss to each
24   victim."   U.S.S.G. § 2F1.1, App. Note 9; United States v. Koenig, 952
25   F.2d 267, 271-72 (9th Cir. 1991) (affirming district court's method
26   of loss calculation where court multiplied average value of
27   counterfeit ATM cards by the number of cards defendants had attempted
28   to make).   "[I]t is permissible for the sentencing court, in

26

1  calculating a defendant's offense level, to estimate the loss

2  resulting from his offenses by extrapolating the average amount of

3  loss from known data and applying that average to transactions where

4  the exact amount of loss is unknown." United States v. Bryant, 128

5  F.3d 74, 76 (2d Cir. 1997).  The Ninth Circuit has approved

6  statistical sampling as a reasonable method for estimating the total

7  amount of loss for sentencing.  See United States v. Scrivener, 189

8  F.3d 944, 950 (9th Cir. 1999), as amended (Nov. 10, 1999) (approving

9  the extrapolation of fraud in a sample to estimate the amount of

10 intended loss in defendant's conduct at a whole).

11       Defendant billed Medicare $12,476,350 for vein ablation and

12 related procedures.  Based on Dr. Zimmet's and Medicare's analyses,

13 the total amount billed should be defendant's intended loss for

14 sentencing purposes, which corresponds to a 20-level enhancement

15 pursuant to U.S.S.G. §2B1.1 for losses between $9,500,000 and

16 $25,000,000.

17       **B.    Federal Health Care Offense**

18       Section 2B1.1(b)(7) of the Sentencing Guidelines provides that a

19 3-level enhancement applies to defendants convicted of a federal

20 health care offense involving a government health care program if the

21 loss is more than $7,000,000.  U.S.S.G. § 2B1.1(b)(7).  Here, the

22 loss to the Medicare program, a government health care program, is

23 $12,476,350 and thus this 3-level enhancement should be applied.

24       **C.    Abuse of a Position of Trust**

25       The government agrees with the USPO's determination in the

26 revised PSR that a 2-level enhancement applies for abuse of a

27 position of trust under U.S.S.G. § 3B1.3.  The Sentencing Guidelines

28 define "a position of public trust" as one "characterized by

27

professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. n.1. The Ninth Circuit has explained that "the presence or lack of 'professional or managerial discretion' represents the decisive factor in deciding whether a defendant occupied a position of trust," and that "[a] defendant has this discretion when, because of his or her special knowledge, expertise, or managerial authority, [he or she] is trusted to exercise substantial discretionary judgment that is ordinarily given considerable deference." United States v. Laurienti, 731 F.3d 967, 973 (9th Cir. 2013)(internal citation and quotation marks omitted). As a medical doctor and owner of his clinics, defendant had both professional and managerial discretion at his clinics and Medicare trusted defendant to submit truthful claims. Defendant abused his position of trust by billing Medicare for medically unnecessary vein ablations and by billing Medicare using the incorrect CPT code, even though he had promised Medicare that he would only submit claims for medically necessary services and claims that were accurate, complete, and truthful, and that he would not submit fraudulent claims, or submit claims with reckless disregard for their truth. (Trial Tr. 1346:4-1347:5.) In addition, defendant violated the trust of his patients by providing them with painful, invasive procedures that they did not need. (Trial Tr. 789:19-790:9.) On top of that, defendant continued performing the procedures on his patients despite "10 out of 10" pain, infections, and nerve injury. (Trial Tr. 852:17-853:24; 871:23-872:6; 877:20-878:22; 879:2-880:6; 880:22-881:19.) He further put many of his patients at grave risk by reusing the single use vein catheters, which were clearly marked as

1  single use only, and the reuse of which could cause infection and

2  bodily harm.  (Trial Tr. 1073:6-24; 1073:25-1074:18.)

3     Therefore, as set forth in the revised PSR, the enhancement

4  should be applied.  (PSR ¶ 48.)

5  **V.   RESTITUTION**

6     The Court should order defendant to pay restitution to Medicare

7  in the amount of $4,587,533.79, which is the amount that Medicare

8  paid based on the false and fraudulent billings that the defendant

9  submitted or caused to be submitted.  <u>See</u> Trial Exhibit 1201.  This

10  is the amount recommended in the revised PSR.  (Revised PSR ¶ 120.)

11     **A.   The Court Must Order Restitution in this Case**

12     Title 18, United States Code, Section 3663A mandates restitution

13  for offenses against property under Title 18, including any offense

14  committed by fraud or deceit, and for any offense in which an

15  identifiable victim has suffered pecuniary loss.  Under Section

16  3663A, the Court must order full restitution without regard to

17  defendant's economic situation.  18 U.S.C. § 3664(f)(1)(A).  The

18  Court shall order full and immediate payment of restitution, unless,

19  in the interest of justice, the Court provides for payment on a date

20  certain or in installments.  18 U.S.C. § 3572 (d)(1).  "Immediate

21  payment of restitution is the general rule."  <u>United States v.</u>

22  <u>Martin</u>, 278 F.3d 988, 1006 (9th Cir. 2002).  <u>See also</u> <u>id.</u> (finding

23  that the district court did not err in following the general rule

24  because it had information regarding the defendant's financial

25  resources that it had "presumably considered and found insufficient

26  to warrant periodic payments"); <u>see generally</u> <u>United States v. Ross</u>,

27  310 F. App'x 160, 162 (9th Cir. 2009) (finding that "immediate

28  repayment is the rule" but that "[e]xceptions may be made in the

interests of justice, such as when the defendant is not able to make more than nominal periodic payments," and the defendant carries the burden of proving such inability).

Here, defendant was convicted of seven counts of health care fraud in violation of 18 U.S.C. § 1347, which are crimes involving fraud or deceit and crimes for which an identifiable victim has suffered pecuniary loss for purposes of Section 3663A.  Therefore, pursuant to 18 U.S.C. § 3663A, the government requests that the Court order that defendant pay $4,587,533.79 in restitution to Medicare.

While the Court shall order restitution "without consideration" of defendant's financial circumstances, 18 U.S.C. § 3664 (f)(1)(A), the restitution payment order must specify the manner in which, and the schedule according to which, restitution is to be paid, by taking in consideration: (a) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (b) projected earnings and other income of the defendant; and (c) any financial obligations of the defendant; including obligations to dependents.  18 U.S.C. § 3664 (f)(2).

Defendant bears the "burden of demonstrating" defendant's financial resources, and was obligated to "prepare and file with the probation officer an affidavit fully describing defendant's financial resources, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested . . . ."  18 U.S.C. § 3664(d)(3) and (e) (emphasis added).  As expressly set forth in Section 3664(d)(3) and (e), defendant's financial resources include assets that defendant "owns," as well as those that defendant "controls."  Thus, the Court's consideration of defendant's "financial resources and other assets" when devising a

restitution payment order pursuant to § 3664(f)(2), should include both the assets that defendant "owns" and those that defendant "controls."

The Court's consideration under Section 3664(f)(2) is not limited to just those resources and assets to which defendant holds legal title at the time of sentencing.  The express language of Section 3664 reflects that Congress intended the Court to look beyond those assets to which defendant holds legal title when fashioning a payment plan order.  A defendant must provide the United States Probation Office with "an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested . . . ." 18 U.S.C. § 3664(d)(3)(emphasis added).  In reviewing the information in this affidavit, the Court must consider all the "financial resources and other assets" available to a defendant, including those that are "jointly controlled."  18 U.S.C. § 3664 (f)(2)(A).[3]

> **B.   Restitution Is Due and Payable Immediately, but Defendant May Pay According to the Recommended Schedule While the Government Pursues Other Avenues to Satisfy the Restitution Order**

---

[3] The specificity of the language used in the statute directs the Court to look beyond ownership or the legal title of property when fashioning a restitution payment order to consider all financial resources and assets generally available to defendant.  See generally Duncan v. Walker, 533 U.S. 167, 174 (2001) (holding that it is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."); see also United States v. Menasche, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.").

1    In the event the Court finds that defendant is unable to make
2    immediate payment of restitution in full, pursuant to 18 U.S.C.
3    § 3664(f)(1)-(3), this Court should order the restitution "due and
4    payable immediately," while setting a payment schedule for the
5    restitution.  United States v. Gunning, 339 F.3d 948 (9th Cir. 2003).
6    The government has reviewed the "Assessment of Ability to Pay" in the
7    revised PSR and disagrees with the recommendation.  As set forth in
8    the government's objections to the revised PSR, the government
9    asserts that defendant has omitted the proceeds of a $37,500 transfer
10   to defendant.  Consequently, the government requests that the Court
11   make a finding that, in the interest of justice, restitution is to be
12   paid in installments and order an immediate payment of at least
13   $37,250 within 30 days of entry of this judgment.

14   The existence of a payment schedule does not preclude the
15   government from pursuing other avenues of ensuring that defendant's
16   restitution obligation is satisfied.  See United States v. Hawkins,
17   392 F. Supp. 2d 757, 760 (W.D. Va. 2005); United States v. James, 312
18   F. Supp. 2d 802, 806-07 (E.D. Va. 2004).

19   To ensure the enforcement of the mandatory restitution order, as
20   well as all of defendant's Court-ordered financial obligations, the
21   government respectfully requests that the Court order the following:

22   1.  Defendant shall notify the Court of any material change in
23   defendant's ability to pay, including without limitation any
24   increases in wages, income, or assets.

25   2.  Defendant shall apply all monies received from income tax
26   refunds to the outstanding Court-ordered financial obligation. In
27   addition, defendant shall apply all monies received from lottery
28   winnings, inheritance, judgments and any anticipated or unexpected

financial gains to the outstanding Court-ordered financial obligation.

3.    Defendant shall notify the Financial Litigation Section of the United States Attorney's Office for the Central District of California before transferring any interest in real property, owned directly or indirectly by defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations.

4.    The United States Probation Office shall preserve and provide the Financial Litigation Section of the United States Attorney's Office for the Central District of California with all the financial documentation relied upon in the preparation of the Presentence Report, including any net worth and cash flow statements completed by defendant.

## VI.    ANALYSIS OF THE SECTION 3553(a) FACTORS

The federal statute governing sentencing requires district courts to take the applicable Sentencing Guidelines range into consideration when sentencing, along with other sentencing factors enumerated by Congress.  See 18 U.S.C. § 3555; United States v. Booker, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").  When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark."  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quotations omitted).  Once the Court calculates the defendant's Sentencing Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by Probation and the parties.  Id. These

factors include, among others: (a) the nature and circumstances of defendant's offense and his history and characteristics; (b) the need for the sentence contemplated to, among other things; (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of defendant; and (c) the need to provide restitution to the victim of defendant's offenses.

The government submits that the Section 3553(a) factors support a sentence of 120 months in custody for defendant.  Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

## A.   Nature and Circumstances of the Offenses

Defendant's crimes were serious because he took advantage not only of the Medicare program, a taxpayer-funded program that is designed to provide critical health services to some of the most vulnerable members of society, but also because he took advantage of elderly Medicare beneficiaries themselves.  Evidence introduced at trial demonstrated that defendant submitted and caused to be submitted to Medicare millions of dollars of false and fraudulent claims for medically unnecessary vein ablations.  (Trial Tr. at 746-47; Ex. C (SGS Medical Review) at 1, 2, 4.)  More importantly — and egregiously — defendant continued to subject his elderly Medicare patients to these unnecessary procedures even when they reported "10 out of 10" pain, infections, and nerve injury.  (Trial Tr. 852:17-853:24; 871:23-872:6; 877:20-878:22; 879:2-880:6; 880:22-881:19.) Defendant also put patients at grave risk by reusing the single use

vein catheters, which were clearly marked as single use only, the reuse of which could cause infection and bodily harm. (Trial Tr. 1073:6-24; 1073:25-1074:18.)

Between 2012 and 2015, defendant submitted these false and fraudulent claims to Medicare for unnecessary ablations, upcoding the claims to receive a higher and unwarranted reimbursement. Defendant billed Medicare approximately $12,476,350 for these procedures and related ultrasounds. During this time period, improper payments from Medicare, including those resulting from fraud, were estimated to be approximately $36 billion in fiscal year 2013 and $45 billion in fiscal year 2014. See Department of Health & Human Services, Centers for Medicare & Medicaid Services, Annual Report to Congress – Medicare and Medicaid Integrity Programs for Fiscal Years 2013 and 2014 at 60, available at https://www.cms.gov/about-cms/components/cpi/downloads/2016-07-15-fy-2013-2014-mandm-pi-rtc-final.pdf. Schemes like the one perpetuated by defendant threaten the Medicare program and jeopardize its ability to provide much needed health care benefits to the elderly and disabled. Thus, defendant's crimes were serious and a sentence of 120 months is appropriate.

**B.   History and Characteristics of the Defendant**

Defendant's history and characteristics counsel a significant sentence in this case. See 18 U.S.C. § 3553(a)(1). Defendant was raised in a middle-class environment where he always had food, clothing, and shelter, and he benefited from a close family relationship with his parents and five siblings. PSR ¶¶ 75, 76. He was privileged to obtain a Bachelor of Science from University of California Riverside in 1988 and a medical degree from St. George's

35

Medical School in 1994.  Id. ¶¶ 90, 91.  Unlike many other defendants in the criminal justice system, defendant had an education and a skill set that provided him with options.  Indeed, he has been able to support his wife, who is a homemaker, and children in a comfortable lifestyle, including by sending them to expensive private college such as Pepperdine University.  Id. ¶¶ 79, 80.  He was able to obtain between $30,000 and $50,000 per month from his medical practice, and took home between $200,000 and $360,000 per year.  Id. ¶¶ 95, 97, 98.  However, rather than own and operate a medical clinic that submitted legitimate claims to Medicare and live off a moderate salary, defendant chose to take advantage of the Medicare program and Medicare beneficiaries by performing medically unnecessary services and submitting false and fraudulent claims in order to line his pockets.

The government recognizes that defendant is a first-time offender without a prior criminal record; however, it is worth noting that defendant has pending charges in Riverside County Superior Court that still have not been resolved and pre-date the charges in this case.  Moreover, defendant was convicted of three separate crimes charged in the FSI (health care fraud, adulteration of a medical device, and false statements in bankruptcy).  In addition, after his conviction in this matter, defendant ignored the Court's order to stop practicing medicine and the government's concerns about his activities with foreign unapproved products.  Defendant solicited patients to receive treatments such as a penis enlargement, trained others on how to perform thread lifts, and provided Botox to a patient.  Defendant also imported products from Korea that were not approved for use in the United States and sold them to physicians and

doctors' offices for use on patients.  Defendant also actively attempted to avoid detection of his unlawful and dangerous activities by using Telegram instead of text messaging because he believed Telegram would not be monitored by the government.  Thus, defendant's lack of criminal history does not warrant an additional variance; rather, his continued conduct of violating the law and putting patients' safety and health at risk for the benefit of his own greed warrants the highest possible sentence available within the guidelines.

Accordingly, defendant's history and characteristics weigh in favor of a sentence of 120 months in custody.

### C.    Deterrence, Promoting Respect for the Law, and Punishing Defendant for His Crimes

A sentence of 120 months is appropriate to deter others from engaging in similar illegal conduct.  Individuals who are engaged in Medicare fraud schemes like defendant's make a calculated decision that the risk of being caught and punished is worth the illicit proceeds that they can obtain from the Medicare program.  As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for white collar criminals in order to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business."  S. Rep. No. 98-225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259.  A sentence of 120 months will serve to affect that calculus and cause individuals to decide that the money to be gained from the Medicare program is not worth the risk of incarceration.  A 120-month sentence will deter defendant and others, particularly other physicians, from engaging in health care fraud in the future.

Defendant orchestrated this scheme to defraud Medicare by submitting and causing the submission of false and fraudulent claims for vein ablation and related ultrasounds.  As the owner of his clinics, defendant benefitted financially from this fraud.  This offense should result in a meaningful custodial sentence.  By requiring defendant to spend 120 months in custody, the Court will impress upon defendant the seriousness of his crimes and will give defendant time to reconsider his actions in light of the consequences.

Furthermore, a sentence of 120 months will promote respect for the law and will adequately punish defendant for his unlawful scheme that resulted in a loss to Medicare of at least $4,587,533.79.

**VII. CONCLUSION**

For the foregoing reasons, the government respectfully submits that sentence requested by the government is sufficient, but not greater than necessary, to provide just punishment to defendant for his crimes, promote respect for the law, and deter defendant and others from committing similar crimes in the future.  See 18 U.S.C. § 3553(a).  The government thus recommends that the Court sentence defendant to 120 months imprisonment, three years of supervised release, order $4,587,533.79 in restitution, and impose a $900 special assessment.